IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| COOPER INDUSTRIES, LTD., | ) |
| | ) |
| and | ) |
| | ) |
| COOPER US, INC., | ) |
| | ) **Civil Action No.** |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, PA., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFFS' ORIGINAL COMPLAINT

1. Plaintiffs, Cooper Industries, Ltd. and Cooper US, Inc, for their Complaint against Defendant, National Union Fire Insurance Company of Pittsburgh, Pa., state as follows:

### NATURE OF THE ACTION

2. This is an action by Plaintiffs against Defendant for breach of a policy of insurance, for breach of its duty of good faith and fair dealing, and for violation of Section 541.060 of the Texas Insurance Code. Specifically, Plaintiffs seek compensatory damages for the Defendant's failure, without reasonable justification or adequate investigation, to pay under a commercial crime policy for the loss of certain assets that those employee benefit plans invested pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA")—a loss that the plans sustained directly as a result of a theft by, or other fraudulent and dishonest acts committed by, the plans' outside managers and fiduciaries.

-1-

CLI-1982768v1

## THE PARTIES

3. Cooper Industries, Ltd. ("Cooper Industries") is a limited liability company organized and existing under the laws of Bermuda with its principal place of business in Houston, Texas.

4. Cooper US, Inc. ("Cooper US") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas. Cooper US is a subsidiary of Cooper Industries and is the sponsor of a number of defined benefit pension plans subject to ERISA (the "Cooper Plans"). Cooper Industries, Cooper US and the Cooper Plans are hereinafter referred to collectively as "Cooper."

5. National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") is a corporation organized under the laws of the State of Pennsylvania with its principal place of business located in New York, New York. National Union is a subsidiary of the Chartis, Inc. and will hereinafter be referred to as "Chartis."

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332 because Cooper Industries and Cooper US are not citizens of the same states as Chartis, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

7. Venue is proper in the Southern District of Texas because a substantial part of the events and transactions giving rise to the controversy occurred in the Southern District of Texas, as required by 28 U.S.C. § 1391. Among other things, many of the activities of the defalcating fiduciaries who stole plaintiffs' money occurred in Houston, Texas; Chartis delivered the insurance policy at issue to in Houston, Texas; Cooper approved and initiated payment of premiums for the policy from Houston, Texas; the broker who placed the policy is

located in Houston, Texas; most, if not all, face-to-face placement meetings between Chartis and Cooper took place in Houston, Texas; all correspondence from Chartis to Cooper was directed to Cooper's Risk Management Department in Houston, Texas; and Cooper submitted its proof of loss from Houston, Texas.

8. Personal jurisdiction in Texas is proper because, at all relevant times, Chartis has been licensed or authorized to sell insurance in Texas and has transacted business in Texas, including with Cooper, by performing a series of acts within Texas for the purpose of realizing pecuniary benefit, including contracting to insure persons, property, or risks located in Texas. In addition, the insurance policy at issue is endorsed with a "Texas Changes" endorsement, which endorsement requires Chartis to comply with various provisions of the Texas Insurance Code.

## THE COMMERCIAL CRIME POLICY

9. Cooper Industries and its successors and predecessors have purchased commercial crime policies from Chartis or its affiliates, without interruption, since at least 1992.

10. For the time period from October 1, 2008, to October 1, 2009 (the "Policy Period"), Cooper Industries purchased a commercial crime policy from Chartis with $10 million in limits (the "Policy"). A copy of the Policy is attached hereto as Exhibit A.

11. Endorsement 18 of the Policy provides, in relevant part, that the term "Insured" shall include "[a]ny Employee Benefit Plan sponsored by the named Insured(s) now existing or hereinafter created or acquired or required to be bonded under the Employee Retirement Income Act of 1974."

12. Insuring Agreement A provides, in relevant part, that coverage "applies to loss that you sustain resulting directly from an 'occurrence' taking place during the Policy

Period shown in the Declarations, except as provided by Condition E.1.o. . . ."  Condition E.1.o further provides that if the Insured discovers a "loss" during the Policy Period shown in the Declarations, resulting directly from an 'occurrence' taking place partly during the Policy Period shown in the Declarations [] and partly during the Policy Periods of any prior cancelled insurance [issued by Chartis]," then the Policy will pay the full amount of the "loss" sustained by the Insured during the Policy Period.

13. For purposes of Insuring Clause A.1, the term "occurrence" is defined as:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related:

Committed by an "employee" acting alone or in collusion with others, during the Policy Period, except as provided under Condition E.1.o or E.1.p.

14. Insuring Clause A.1 of the Policy provides that Chartis "will pay for loss of or damage to 'money', 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee', whether acting alone or in collusion with others."  (All of the policy terms within quotation marks are defined terms.)

15. The Policy defines the term "theft" as "the unlawful taking of property to the deprivation of the Insured."

16. Condition E.h.(3) of the Policy further provides that with respect to those "employee benefit plans" listed in the Declarations, Insuring Clause A.1 is replaced with the following:  "[Chartis] will pay for loss or damage to 'funds' and 'other property' resulting directly from fraudulent or dishonest acts by an 'employee,' whether identified or not, acting

-4-

alone or in collusion with others." The term "funds" is defined to include "money" or "securities."

17. Endorsement 10 of the Policy defines the term "employee" to include, among other things, "[a]ll U.S., U.K. and Canadian Fiduciaries."

18. Endorsement 12 of the Policy further expands the definition of "employee" as follows:

> 1. F. Definitions, "Employee" is hereby amended to include the following:
>
>    a) A trustee, administrator, employee or manager, including any outside administrator or manager, who is an independent contractor, of any Employee Welfare or Pension Benefit Plan(s) (hereinafter called Plan) insured under this Policy.
>
>    b) Any natural person required to be bonded in accordance with Section 412 of the Employee Retirement Income Act.
>
> 2. Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the policy other than as above stated.

## THE EMBEZZLING FIDUCIARIES

19. Westridge Capital Management, Inc. ("Westridge") is and was a Delaware corporation with its principal place of business located in the State of California. Westridge was formed by Paul Greenwood, Stephen Walsh and James Carder in 1996. At all relevant times, Greenwood and Walsh, as described further below, were control persons of Westridge and together owned a majority of Westridge's common stock. In or around 2000, several years after Greenwood and Walsh had set up the Ponzi scheme described below, Walsh and Greenwood resigned their positions as officers and directors of Westridge, but they continued to maintain control over Westridge. As determined by the United States Securities and Exchange Commission ("SEC") in its investigation of Westridge, Greenwood and Walsh

were "owners, and thus supervised persons of [Westridge], and had access to all client funds that were invested in or passed through WG Trading and Westridge" and thus "they had custody of the applicable client's assets" managed by Westridge.

20. WG Trading Company, L.P. ("WG Trading") was a limited partnership organized under the laws of the State of Delaware with its principal place of business located in Greenwich, Connecticut.  WG Trading was registered as a broker-dealer under the Securities Exchange Act of 1934 and was a commodity pool as defined in the Commodity Futures Trading Commission Regulations.  WG Trading was the entity that was supposed to be engaged in the index arbitrage strategy promoted by Westridge, Greenwood and Walsh.  At all relevant times, Greenwood and Walsh were the managing general partners of WG Trading.

21. WG Trading Investors, L.P. ("WG Investors") was a limited partnership organized under the laws of the State of Delaware with its principal place of business located in Greenwich, Connecticut.  As described below, the only stated purpose of WG Investors was to facilitate investments in WG Trading.  At all relevant times, Greenwood and Walsh were the managing general partners of WG Investors.

22. As explained above, Paul Greenwood was a co-owner and control person of Westridge at all relevant times.  He was also the co-general partner, Chief Operating Officer and Chief Financial Officer of WG Trading.  He was also the co-general partner of WG Investors.  In September 2010, Greenwood pled guilty to defrauding investors in the Ponzi scheme described below.

23. Stephen Walsh was a co-owner and control person of Westridge at all relevant times.  Walsh was also a co-general partner, Chief Executive Officer and the senior registered options principal of WG Trading.  Walsh was also a co-general partner of WG

CLI-1982768v1

Investors. Walsh has been charged with conspiracy, securities fraud, commodities fraud, wire fraud, and money laundering for his role in orchestrating and perpetrating the Ponzi scheme.

## THE LOSS

24. During the relevant time period, the Cooper Plans' assets were managed by The Pension Committee of Cooper Industries. The Cooper Plans' assets are now managed by The Cooper Benefit Plans Committee (together with its predecessor, The Pension Committee of Cooper Industries, the "Committee"). Under the applicable management procedures for the Cooper Plans, the Committee had (and has) fiduciary responsibilities for the management of the Cooper Plans' assets.

25. On or about December 15, 2004, after performing substantial and appropriate due diligence, the Committee entered into an Investment Management Agreement with Westridge for the management of certain assets of the Cooper Plans in a particular portfolio of investments (the "Bond Fund Management Agreement"). The portfolio of investments was titled the "Enhanced Bond Index Arbitrage Fund" (the "Bond Fund"). Under the Bond Fund Management Agreement, Westridge was appointed as the investment manager for the Bond Fund and was named as an ERISA fiduciary with respect to that account as well as the Cooper Plans whose assets formed the account.

26. Several months before investing in the Bond Fund, in April 2004, Cooper had entered into another agreement with Westridge to manage its Enhanced Equity Index Arbitrage Fund (the "Equity Fund"). The purported investment strategy for the Equity Fund was one of tracking the performance of the S&P 500, where a portion of the investment was supposed to be used to support a leveraged futures equities position in the same amount as the total cash investment. The Equity Fund was supposed to provide market-matching or even

market-exceeding returns (i.e., in excess of the S&P 500 index) with reduced risk. In April 2008, Cooper redeemed all of the assets it then had invested in the Equity Fund.

27. The Bond Fund, on the other hand, was supposed to be comprised of a basket of investments that would provide a "synthetic" rate of return that would largely mimic, but outperform, the Merrill Lynch 1-3 year treasury index. Thus, pursuant to the Bond Fund Management Agreement, Westridge was supposed to invest the assets in a portfolio of investments that would provide an enhanced rate of return over the Merrill Lynch 1-3 year treasury index with a similar level of risk to that index.

28. Under the investment guidelines attached to the Bond Fund Management Agreement, Westridge was to mimic the Merrill Lynch 1-3 year treasury index by using a small amount of the invested assets—approximately 5%—to buy and maintain leveraged positions in futures contracts on fixed income securities. Westridge was to invest the remaining assets—approximately 95%—with WG Trading in order to access the arbitrage strategy of that partnership.

29. Cooper's investment in WG Trading was supposed to be accomplished through private placement notes to be issued by WG Investors. Westridge and WG Trading told Cooper that they could invest "in WG Trading" by purchasing private placement notes issued by WG Investors. Westridge told Cooper that WG Investors existed solely to facilitate investments in WG Trading, and that WG Investor's only asset was its limited partnership stake in WG Trading. The "interest" on the notes issued by WG Investors was supposed to equal the return on an investment, in an amount equal to the principal of the note, in a limited partnership interest in WG Trading. Indeed, investors, including Cooper, were told that there would be no difference in returns based on whether its investment was as a limited partner in

WG Trading or as a note holder with WG Investors. Westridge and WG Trading promised that no changes to the WG Trading partnership agreement would be made without providing Cooper with advance notice of any such changes. Further, WG Investors was required to maintain only 1% equity to support the notes (and at relevant times it did not even meet this minimum requirement). The term of the notes was indefinite, automatically renewing unless Cooper issued a notice of non-renewal six months in advance. This six month advance notice for redemption of capital was the same notice required for redemptions by the limited partners of WG Trading. When Cooper redeemed these notes, as it did from time to time, Cooper would correspond directly with Paul Greenwood at WG Trading to arrange for the redemption of "capital", not with WG Investors.

30. On information and belief, Westridge wanted ERISA plan investors to invest in WG Trading through the private placement notes in an attempt to prevent WG Trading from being deemed to have authority and control over ERISA plan assets, since most of the assets used to purchase notes through WG Investors were benefit plan assets.

31. By the end of 2008, and pursuant to the terms of the Bond Fund Management Agreement, Cooper had invested $35,150,000 in the arbitrage strategy of WG Trading. As of December 31, 2008, Westridge's accounts statements stated that the total market value of the Bond Fund as a whole was $47,861,697.

32. Unbeknownst to Cooper, since at least 1996, Walsh and Greenwood had been engaged in a scheme involving misappropriation of hundreds of millions of dollars from investors to pay personal expenses and luxuries for themselves and to engage in unauthorized investments. Greenwood and Walsh, through their control of Westridge, WG Trading and WG Investors, orchestrated a pervasive and unitary Ponzi scheme that ultimately collapsed in

CLI-1982768v1

2009. Even though Westridge, WG Trading and WG Investors were organized as separate entities and were presented to investors as merely affiliated entities, in reality they operated as a single entity in order to keep the scheme going. Among other acts of theft, fraud and dishonesty, Greenwood and Walsh, with the help of other WG Trading employees, would withdraw investor money from WG Trading in exchange for worthless personal notes.

33. In furtherance of their scheme, Walsh and Greenwood used Westridge to market WG Trading's investment strategies. Although Greenwood and Walsh resigned from their official management positions at Westridge in 2000, they controlled Westridge and selected, and supervised its employees, officers, and directors. As a result, Greenwood and Walsh maintained substantial *de facto* control over Westridge's employees and Westridge's investment decisions. Further, early on in the scheme, Greenwood and Walsh set Westridge on a path of luring pension plans and other institutional investors into their Ponzi scheme by assuring investors that because of their arbitrage strategy, the level of risk for the investments was equal to the level of risk for the indexes they were supposed to mimic. But only a small amount of the money that was supposed to be invested in the index arbitrage strategy was so invested.

34. Also in furtherance of the scheme, Westridge sent out account statements that falsely reported the assets and earnings held in investors' accounts, which Westridge either knew, or should have known upon a reasonable investigation, were false. In violation of its fiduciary obligations, Westridge never reviewed the financial and trading data for WG Trading to determine whether it was appropriately investing the assets it controlled. Greenwood and Walsh directly participated in and controlled this breach of Westridge's fiduciary duties, since Greenwood and Walsh knew that the assets were not being invested

appropriately and, through their control of Westridge, ensured that the Westridge employees they supervised never investigated how the invested assets were actually being used.

35. On February 5, 2009, the National Futures Association (''NFA") auditors commenced an audit of Walsh and Greenwood. On February 12, 2009, the NFA issued a Member Responsibility Action (the "Action") and suspended Walsh and Greenwood from NFA membership.

36. On February 25, 2009, as a result of action taken by the Commodity Futures Trading Commission and the SEC, the United States District Court for the Southern District of New York (the "district court") entered an Order appointing a temporary Receiver and freezing all of the assets of Westridge, WG Trading, and WG Investors, as well as the assets of Greenwood and Walsh. The Receiver undertook efforts to gather the assets, liquidate non-cash property that belongs to, or should belong to the Receivership, and commenced a process of determining the best administrative method for distributing the remaining assets to the investors.

37. The Receiver's investigation ultimately revealed that Walsh and Greenwood used money funneled out of WG Trading and WG Investors, including the Cooper Plans' assets, to purchase lavish homes, horse farms, expensive cars, horses, and rare collectibles such as Steiff teddy bears. The Receiver's reports establish that the operation of the Walsh and Greenwood-controlled entities was that of a Ponzi scheme, and that substantial money was fraudulently and improperly used to line Greenwood and Walsh's pockets, resulting in substantial harm to investors.

38. Because all of the Westridge-related entities' assets were placed in receivership, Cooper could not redeem any of the Bond Fund it had invested in WG Trading through the private placement notes.

39. Cooper timely notified Chartis of the potential loss in or around May 2009. Although the full amount of the loss could not be calculated at that time, it appeared almost certain that Cooper's loss would exceed the Policy limits.

40. On July 7, 2009, the Receiver demanded a sum of $21,782,121 from Cooper, which the Receiver said was the amount redeemed by Cooper in excess of the amounts it had invested in the Westridge scheme.

41. On or about July 24, 2009, Walsh and Greenwood were indicted on several federal counts of conspiracy, securities fraud and wire fraud.

42. On January 29, 2010, Cooper timely filed a proof of loss with Chartis.

43. In October 2010, Cooper filed with the district court its recommended plan for distribution of the Receivership assets. Cooper (like other note holders of WG Investors) took the position that the limited partners in WG Trading should be subordinated to the holders of notes issued by WG Investors. The Receiver, and ultimately the district court, rejected that proposed distribution.

44. On February 9, 2011, over a year after Cooper submitted its proof of loss, Chartis sent a response to the proof of loss, stating that Cooper's proof of loss was "premature," because, among other things, the amount that Cooper stood to lose from the Westridge scheme was still "speculative" because the Receiver was seeking a "claw back."

45. On March 21, 2011, the district court approved the Receiver's plan for distribution of the Westridge-related entities' assets. Pursuant to its claims approval and

CLI-1982768v1

interim distribution orders, the district court, among other things, (1) approved and allowed Cooper's claim as a "losing investor" in the sum of $35,150,000, which was to be treated equally with all other investors in the scheme (whether those other investors had invested in WG Trading through notes or through limited partnership interests), and (2) ordered the Receiver to withhold from the interim distribution otherwise payable to Cooper a sum equal to the so-called "excess payment" pending resolution of any "claw back" action filed by the Receiver.

46.   On May 20, 2011, the Receiver initiated an action in the United States District Court for the Southern District of New York allegedly to recover those amounts that Cooper had redeemed in excess of its original investment in the Equity Fund (the "claw back action").

47.   Pursuant to a court-approved settlement with the Receiver executed on November 10, 2011 resolving the claw back action, Cooper received a distribution of $ 17,874,603 with respect to the amounts that Cooper had lost in the Bond Fund, yielding a total loss on the Bond Fund of $17,275,397.

48.   On December 7, 2011, Cooper amended its proof of loss and requested that Chartis pay its $10 million in policy limits.

49.   More than four months later, on March 9, 2012, Chartis denied coverage for the loss.

### FIRST CAUSE OF ACTION
### FOR BREACH OF CONTRACT

50.   Cooper repeats and realleges the allegations of paragraphs 1 through 49 hereof as if they were fully set forth herein.

51. Cooper Industries, Cooper US, Inc. and the Cooper Plans are all "Insureds" under the Policy. As the first-named insured, Cooper Industries is authorized under the Policy to act for itself and for every other insured for all purposes, including the Cooper Plans. Under the policy, an "employee" of one "Insured" is an "employee" of every other "Insured."

52. Endorsement 10 of the Policy defines the term "employee" to include, among other things, all "U.S. Fiduciaries." Greenwood, Walsh, Westridge, WG Trading and WG Investors are all U.S. fiduciaries of the Cooper Plans.

53. For example, pursuant to 29 U.S.C. § 1102(a)(2), Westridge is a fiduciary of the Cooper Plans because it was named as a fiduciary in the Bond Fund Management Agreement.

54. In addition, and without limitation, pursuant to § 3(21)(A) of 29 U.S.C. § 1002(21)(A), a natural person or entity is a fiduciary with respect to an ERISA plan if that person or entity exercises any authority or control respecting management or disposition of the plan's assets. WG Trading, WG Investors, Greenwood and Walsh were, at all relevant times, "U.S. fiduciaries" because each of them exercised authority or control over the Cooper Plans' assets. Because Westridge, WG Trading, WG Investors, Greenwood and Walsh are each fiduciaries of the insured Cooper Plans, they are each "employees" of an "Insured."

55. In addition, upon information and belief, and without limitation, WG Trading and WG Investors are each fiduciaries of the Cooper Plans because they had authority and control over the assets of benefit plan investors, including Cooper. Upon information and belief, a substantial portion—if not most—of the equity interests held in WG Trading and WG Investors were assets of benefit plan investors. Accordingly, for this

additional reason, WG Trading and WG Investors both meet the Policy's definition of "employee."

56. In addition, and without limitation, Greenwood was a fiduciary under 29 C.F.R. § 2510.3-21 because he made recommendations as to the advisability of investing in, purchasing, or selling securities or other property of the Cooper Plans; and, directly or indirectly (e.g., through or together with any affiliate), had discretionary authority or control with respect to purchasing or selling securities or other property of the Cooper Plans. Accordingly, Greenwood meets the definition of "employee" for this additional reason.

57. In addition, pursuant to Endorsement 12 of the Policy, an "employee" is defined to include an outside administrator and/or manager of the Cooper Plans. The Committee designated Westridge as the Manager and investment advisor for the Cooper Plans. Walsh and Greenwood were the alter egos of Westridge, and thus Greenwood and Walsh are the actual "managers" and "administrators" of the Cooper Plans. Under Texas law, Cooper is entitled to disregard the corporate fiction of Westridge, and to treat Greenwood and Walsh as Westridge, because Greenwood and Walsh used Westridge as a sham to perpetuate fraud, to avoid personal liability, and to avoid their obligations as fiduciaries under ERISA. Because Greenwood and Walsh were "administrators" and "managers" of the Cooper Plans as a matter of law, they each meet the definition of "employee" set forth in Endorsement 12 of the Policy.

58. Cooper lost its "money" and "funds" directly as a result of a "theft" by, or fraudulent and dishonest acts of, "employees."

59. Cooper has complied with all applicable conditions of the Policy, including all conditions relating to notice and proof of loss.

60. No exclusion bars coverage for the loss.

CLI-1982768v1

61. Chartis has refused to pay any part of the loss.

62. By reason of the foregoing, Chartis has breached its contractual obligations under the Policy and Cooper has incurred damages as a result of that breach.

## SECOND CAUSE OF ACTION
## FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

63. Cooper repeats and realleges the allegations of paragraphs 1 through 62 hereof as if they were fully set forth herein.

64. Under Texas law, an insurer acts in bad faith when denying or delaying payment of a first party claim if it should have been reasonably clear that the claim was covered.

65. Chartis knew or should have known that it was reasonably clear that Cooper's loss was covered, but nevertheless denied payment for reasons that had no reasonable basis in either law or fact.

66. As part of its duty of good faith and fair dealing, an insurer must assess claims after an appropriate and careful investigation, and must reach conclusions based upon a fair and honest weighing of the facts and law. An insurer's failure to conduct such an investigation constitutes bad faith.

67. Among other things, Chartis asserted unstated policy limitations and refused to consider evidence uncovered by the SEC and other government agencies in denying the claim.

68. By way of example only, Chartis has asserted that Westridge did not qualify as an "employee" under the Policy because it is not a natural person, even though nothing in the Policy requires the "U.S. fiduciary", "administrator" or "manager" of an employee benefit plan to be a natural person.

69. Similarly, Chartis has taken the position that Cooper's losses are excluded "trading losses" without any investigation into how *Cooper's* money was used. In the bogus account statements sent to Cooper, Westridge did not record even a fictitious trading loss on Cooper's account. Further, there is no other evidence that the Westridge-related entities "lost" the Cooper Plans' assets through trading in securities.

70. As a result of Chartis' breach of its duty of good faith and fair dealing, Cooper has been damaged. Cooper is entitled to recover those damages, including the consequential damages to Cooper from the wrongful denial and delay in payment of the claim, as well as its attorneys fees in prosecuting this action

### THIRD CAUSE OF ACTION
### FOR VIOLATION OF SECTION 541.060 AND 541.151
### OF THE TEXAS INSURANCE CODE

71. Cooper repeats and realleges the allegations of paragraphs 1 through 70 hereof as if they were fully set forth herein.

72. Section 541.060 of the Texas Insurance Code identifies categories of unfair settlement practices. The categories of unfair settlement practices include, among other things, (1) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim where the insurer's liability has become reasonably clear(§ 541.060(2)(A)); (2) failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy for the insurer's denial of a claim (§ 541.060(3)); (3) failing within a reasonable time to affirm or deny coverage of a claim to a policyholder or submit a reservation of rights to the policyholder (§ 541.060(4)(A)-(B)); and (4) refusing to pay a claim without conducting a reasonable investigation (§ 541.060(7)).

73. As described above, Chartis failed to provide Cooper promptly with a reservation of rights or denial of coverage, refused to pay the claim without conducting a

reasonable investigation, and failed to attempt to effectuate a good faith settlement after its liability had become reasonably clear.

74. Because Chartis has knowingly violated Sections 541.060(2), (3), (4), and (7) of the Texas Insurance Code, Cooper is entitled under Section 541.151 of the Code (unfair competition and deceptive trade practices) to recover those damages caused by the unfair and deceptive acts or practices of Chartis in this business of insurance, including the consequential damages to Cooper from the wrongful denial and delay in payment of the claim, as well as treble damages and its attorneys fees in prosecuting this action.

## **JURY TRIAL DEMAND**

75. Cooper, by counsel and pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands trial by jury on all issues triable of right by a jury.

CLI-1982768v1

## PRAYER FOR RELIEF

WHEREFORE, Cooper respectfully prays for the following:

A.  Judgment in favor of Cooper and against Chartis on this Complaint, in an amount to exceed $75,000; and

B.  An Order awarding Cooper such other and further relief as the Court deems just and proper, including, but not limited to, prejudgment interest, treble and punitive damages, and Cooper's attorney fees, costs and expenses associated with bringing this claim.

By: */s/ Kevin F. Feeney*
Mark J. Andreini (*attorney-in-charge*)
Ohio State Bar No. 0063815
*pro hac vice* admission pending
mjandreini@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939
(216) 579-0212 (facsimile)

Katie J. Colopy (*of counsel*)
Texas Bar No. 04626470
Southern District No. 27649
kjcolopy@jonesday.com
Kevin F. Feeney (*of counsel)*
Texas State Bar No. 24065222
S.D. Tex. Bar No. 1065221
kffeeney@jonesday.com
JONES DAY
717 Texas Street
Suite 3300
Houston, Texas 77002-2712
(832) 239-3939
(832) 239-3600 facsimile

Attorneys for Plaintiffs,
Cooper Industries, Ltd. and
Cooper US, Inc.