United States District Court
Southern District of Texas

**ENTERED**

June 21, 2016

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COOPER INDUSTRIES, LTD., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-01591 |
| | § | |
| NATIONAL UNION FIRE  INSURANCE | § | |
| COMPANY OF PITTSBURGH PA, | § | |
| | § | |
| Defendant. | § | |

## <u>ORDER</u>

Before the Court is Plaintiff Cooper Industries, Ltd.'s Motion for Partial Summary Judgment (Doc. #50), Defendant National Union Fire Insurance Company of Pittsburgh PA's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (Doc. #57), and the responses and replies thereto (Doc. #68, 75, 88, 90). Additionally, the Court has considered oral arguments presented at the hearing on September 21, 2015, supplemental briefs filed on October 9, 2015 (Doc. #101, 102), replies to the supplemental briefs (Doc. #109, 110), and the record in this case.

### I.    Background

This case arises out of losses sustained by Plaintiff Cooper Industries, Ltd.'s ("Cooper")[1] from its investment in a Ponzi scheme and Defendant National Union Fire Insurance Company of Pittsburgh, PA's ("National Union") refusal to pay for those losses under a $10 million commercial crime policy it sold to Cooper ("the Policy").

---

[1] The losses were actually sustained by Cooper's employee benefit plans. Doc. #50 at 14. But the insurance policy at issue covers the employee benefit plans as well, and the Court will refer to them both as "Cooper."

1

### A.  The Policy

From 2003 to 2012, National Union sold commercial crime policies (generally known as fidelity bonds) to Cooper (for simplicity, they are referred to as "the Policy"). The Policy had a limit of $10 million and insured Cooper and Cooper's employee benefit plans against employee theft:

> We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

Doc. #50 at 9.

In the original Policy, the term "employee" was defined as "[a]ny natural person." Doc. # 1-1 at 18. But later amendments to the Policy broadened that definition. Endorsement 10 of the Policy amended the term "employee" to include "All U.S., U.K. and Canadian Fiduciaries." And Endorsement 12 further amended the term "employee" to include "any outside administrator or manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan(s) (hereafter called Plan) insured under this policy." *Id*.; Doc. # 1-1 at 31, 33.

The Policy only covers property that Cooper owns:

> The property covered under this policy is limited to property: (1) That you own or lease; or (2) That you hold for others whether or not you are legally liable for the loss of such property.

Doc. #1-1 at 15.

The Policy also contains various exclusions. The "Trading" exclusion bars coverage for "[l]oss resulting from trading, whether in your name or in a genuine or fictitious account." Doc. #1-1 at 7. The "Indirect Loss" exclusion bars coverage for "[l]oss that is an indirect result of an 'occurrence' covered by this policy" including the "inability to realize income, or for the

payment of damages of any type for which you are legally liable." Doc. #1-1 at 7.

In the event of a loss, the Policy requires the insured to give notice and filed a detailed proof of loss within a certain amount of time:

> Upon knowledge or discovery of loss or of an occurrence . . . , the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and . . . (b) file detailed proof of loss, duly sworn to, with the Company within months after the discovery of loss.

Doc. #1-1 at 27 (emphasis added); Doc. #50 at 9. Later-issued policies—issued on or after October 1, 2009—change the phrase "within months" to "within six months." Doc. #50 at 10.

### B. Cooper invests in Westridge

In 2004, pension plans managed by Cooper began investing in a registered investment advisor called Westridge Capital Management, Inc. ("Westridge"). Doc. #50 at 14. Eventually, Cooper invested approximately $175 million in Westridge. Doc. #50 at 21.[2] Of that, Cooper invested $140 million in an equity fund and $35 million in a bond fund. *Id.*

Unbeknownst to Cooper, Westridge was part of a Ponzi scheme orchestrated by Paul Greenwood and Stephen Walsh, who together owned 51% of Westridge. Doc. #50 at 10. An investment manager named James Carder ("Carder") owned the rest. *Id.* Carder was responsible for Westridge's day-to-day management and decided what investments to make, *id.*, and he did not know about Greenwood and Walsh's fraud. Doc. #75 at 20**.**

The fraudsters Greenwood and Walsh were also owners and co-managing partners of two

---

[2] The amount of Cooper's investments and losses in Westridge is disputed. *See* Doc. #101 at 3 n.2 (National Union alleges that "Cooper presented an entirely new loss analysis in 2015 from what was set for in its complaint which has never been amended."). But for the purposes of this Order, the Court will refer to the amounts listed in Cooper's Motion for Partial Summary Judgment. Doc. #50 at 21.  Any discrepancy is a question of fact that the Court will not explore at this stage.

other corporate entities related to the Ponzi scheme. The first, WG Trading Company LP ("WGTC"), was a registered broker-dealer under the Securities and Exchange Act of 1934. Doc. #57 at 10. The second, WG Trading Investors, LP ("WGTI"), was an unregulated entity whose purpose was to facilitate investments into WGTC, and was itself a limited partner in the first entity, WGTC. *Id.* at 11. Westridge, WGTC, and WGTI are hereafter referred to collectively as "the Westridge Entities."

In 1995, Carder, Greenwood, and Walsh entered into a joint venture to market their funds to investors. Doc. #50 at 13. *Id.* Investors would pay management fees to Westridge, of which Carder would receive 30% and Greenwood and Walsh 35% each. *Id.* at 13-14. A joint marketing presentation was developed to pitch potential investors. *Id.* at 14. According to Cooper, the presentation deliberately misled potential investors by overstating past earnings, among other things. *Id.*

The investment strategy employed by the Westridge Entities was called equity index arbitrage. It worked as follows: Westridge would invest a small portion of each investor's money (5-15% in Cooper's case) in a leveraged futures index. *Id.* at 15. This was known as the "beta" portion of the strategy. *Id.* at 10-11. Then, the balance of each investor's money would be placed in a conservative, low-yield investment. This was known as the "alpha" portion of the strategy. *Id.* The strategy was intended to exploit small differences in pricing between present and future stock indices to generate profit. *Id.* And the strategy did make money—Cooper claims that Westridge generated over $580 million in real profit between 1996 and 2009 via its trading strategies. *Id.* at 19.[3]

---

[3] The Receiver calculated that WGTC and WGTI had combined net earnings of $330.6 million between 1996 and 2008. Doc. #75 at 13. Any discrepancy between Cooper's and the Receivers'

4

With respect to the majority of the money that was invested conservatively—the "alpha" portion—investors could choose to invest it in either WGTC or WGTI. *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 740 (2d Cir. 2013). By choosing the former, the investor would become a limited partner in the regulated entity, WGTC. *Id.* By choosing the latter, the investor would direct its investment to the non-regulated WGTI via senior promissory notes. *Id.* Investors were told there was little difference. Doc. #1 at 8. The interest rate on the WGTI promissory notes was supposed to match the returns of WGTC. WGTC and WGTI commingled funds, and prospective investors were told that the "the only business of WGTI is to invest in WGTC." *Walsh* at 740.[4] Cooper chose to invest the majority of its money via WGTI in exchange for promissory notes. Doc. #57 at 11.

In 2007—before the Ponzi scheme was discovered—Cooper redeemed its $140 million investment in Westridge's equity fund. Doc. #50 at 16. In doing so, Cooper recovered all of its principal plus approximately $42 million in earnings. *Id.* Cooper did not redeem its $35 million investment in the bond fund. *Id.*

### C.  The Ponzi scheme is discovered

In February 2009, Greenwood and Walshs' Ponzi scheme was discovered. The National Futures Trading Association ("NFA") audited WGTC, and on February 12, the NFA suspended Greenwood and Walsh. Doc. #75 at 12. On February 25, the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") filed separate actions in the United States District Court for the Southern District of New York seeking to

---

figures is a question of fact that the Court will not explore at the summary judgment stage.
[4] One difference was that WGTI investors were assured that their returns would not match those of WGTC if WGTC's returns were negative. *Walsh* at 741.

5

freeze the assets of the fraudsters to protect investors. *Id.* at 12-13. The court appointed a Receiver to establish the true financial condition of the Westridge Entities. *Id.*; Doc. #50 at 17.

The Receiver found that WGTC and WGTI had a "long history of . . . com[m]ingling funds, operating with utter disregard for corporate governance, and employing fraudulent accounting practices in an apparent attempt to conceal the true financial condition of the entities from investors, potential investors and, in the case of WGTC, its regulators." *Walsh*, 712 F.3d at 741. The Receiver also found that WGTC and WGTI were operated as one entity with classic Ponzi scheme elements in that fictitious "gains" were fraudulently paid with new investor money or other assets. Doc. #57 at 13. The Receiver calculated that WGTC and WGTI had combined net earnings of $330.6 million between 1996 and 2008, but reported their earnings as $981.7 million. *Id.* Greenwood and Walsh had used WGTC and WGTI to cover up losing investments. For example, at one point WGTC lost $121 million in an investment in a company called Signal Apparel. *Walsh* at 741-42. WGTC charged that loss against WGTI's account to avoid having the loss realized. Doc. #50 at 12-13.

On July 24, 2009, Greenwood and Walsh were indicted for their misappropriation of funds from WGTC and WGTI. Doc. #57 at 14. In addition to fraudulently overstating earnings and covering up losses, they used WGTC and WGTI as their personal bank accounts, withdrawing money for such expenditures as Greenwood's purchase of a hunter-pony farm for over $10 million and a collection of 1,348 Steiff teddy bears for over $3 million. Doc. #50 at 14; *Walsh* at 742. In all, Greenwood and Walsh withdrew over $120 million of investor funds between 2003 and 2009. Doc. #50 at 14.

### D.  The Receiver's claw back action

On May 20, 2011, the Receiver instituted a claw back action against Cooper to recover approximately $22 million of the money that Cooper had received when it withdrew its equity fund investment. Doc. #50 at 19. National Union claims that the claw back was to recover "fictitious profits," Doc. #57 at 15, while Cooper maintains that the money it kept constituted legitimate investment gains. Doc. #68 at 8. In November, Cooper settled the action. Cooper kept about $10 million and the Receiver took the rest. Doc. #57 at 16.

### E.  Cooper provides notice of loss

On May 8, 2009, Cooper gave notice to National Union of a potential loss of approximately $45 million. Doc. #50 at 17.[5] The parties dispute when Cooper actually learned of the loss. National Union claims that Cooper was on notice as early as February 2009, when Cooper learned that the NFA, SEC, and CFTC had taken regulatory action against Greenwood, Walsh, and the Westridge entities. Doc. # 75 at 15.

The parties also dispute how long Cooper had to provide its proof of loss. National Union asserts that Cooper had 120 days after receiving notice to submit the proof of loss, Doc. #75 at 16, while Cooper claims it had six months. Doc. #50 at 26. Cooper eventually submitted its proof of loss on January 29, 2010. Doc. #50 at 18. Under either timeline, the proof of loss was late.

However, National Union had agreed to waive the 120-day proof of loss requirement, and later extended the deadline several times. Doc. #50 at 18. National Union claims it made these extensions based on Cooper's representation that it only learned of the loss in May 2009. Doc.

---

[5] A few days later, National Union claim handler Mark Wolin ("Wolin") recorded that "[t]his is an ERISA claim. We will be investigating whether the entity that employed the perpetrators would be considered an employee under the policy." Doc. #50 at 17.

#57 at 17. In any event, when Cooper finally did submit its proof of loss on January 29, 2010, Cooper could not identify the amount of the loss, claiming it would not know until after the Receiver's investigation and claw back action were resolved. Doc. #57 at 18. Between March and November of 2010, National Union made repeated requests to Cooper for information regarding the loss. *Id.* Cooper did not provide all the requested information until November, 2010. *Id.* In July 2010, a National Union claims handler made an initial conclusion, later abandoned, that Cooper's loss exceeded the Policy limits. Doc. #68 at 27.

National Union hired forensic accountants to assist in analyzing the loss. Doc. #57 at 18. Cooper alleges that these accountants were really "litigation consultants" hired to build a case for denial. Doc. #68 at 27. On February 9, 2011, National Union provided a preliminary coverage opinion. *Id.* The opinion stated that "[b]ased on our review of the policy and information provided, it appears that any [proof of loss] is premature. At the present time, it appears that Cooper has suffered no loss. . . . [U]ntil the liquidation of the assets of Westridge and its related entities by the Receiver is concluded, it is unknown if any loss, insured or uninsured, might exist." Doc. # 50 at 20.

On March 9, 2012, more than two years after receiving the Proof of Loss and nearly three years after receiving notice, National Union formally denied coverage. *Id.* On May 24, 2012, Cooper filed this action.

### F.  The loss

The total amount of the loss is in dispute, but according to Cooper totaled nearly $20 million. Cooper's breakdown of the loss is as follows: In the bond fund, Cooper initially invested $35,150,000. Doc. #51 at 21. Cooper claims it should have recovered the principal plus

$7,627,706 in interest, equaling $42,777,706. *Id.* But instead, Cooper only recovered $31,320,034 of the principal[6] and none of the earnings, yielding a loss of $11,457,672. *Id.*

In the equity fund, Cooper initially invested $140,125,000. *Id.* Cooper recovered both principal and earnings because it redeemed the equity fund investment before the Ponzi scheme was discovered. *Id.* But Cooper forfeited some of the earnings to the Receiver's claw back action. *Id.* Cooper maintains that it should have received $18,338,331 in interest on the equity fund, but only received $9,801,954, yielding a loss of $8,536,377.[7] *Id.*

In total, Cooper claims losses of nearly $20 million. *Id.* The Policy limit is $10 million.

## II.   Legal Standard

### A.  Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence

---

[6] According to National Union, the Receiver is expected to make more distributions to Cooper, which will reduce the amount of the loss. Doc. #57 at 16-17.

[7] Elsewhere, Cooper states that in 2007 it redeemed earnings of $20,282,253 in the equity trust fund account and $21,782,120 on the equity fund note, Doc. # 50 at 16, which amounts to total earnings of $42,064,373. Thus it is unclear to the Court why Cooper maintains it should have received only $18,338,331 in earnings. But that is a question of fact that need not be reached at the summary judgment stage, and in any case, Cooper's claimed losses exceed the $10 million Policy limit either way.

of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.  Contract Construction

The interpretation of insurance contracts is governed by the same rules that apply to contracts generally. *Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695, 700

(5th Cir. 1996). *Id.* They must be interpreted to effectuate the intent of the parties at the time the contracts were formed. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). When the words of a policy are unambiguous, they are to be given their plain, ordinary, and generally accepted meaning, unless the policy clearly indicates that the contractual terms have been used in a different of technical sense. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). When the language of a policy is susceptible to more than one construction, however, it should be construed strictly against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987); *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) (holding that any ambiguities in a policy are construed against the drafter). Where the question of interpretation involves an exception or limitation on the insurer's liability under the policy, an even more stringent construction is required. *Barnett*, 723 S.W.2d at 666.

### III.    Analysis

The parties move for summary judgment on numerous issues. Having considered the arguments and the applicable law, the Court grants summary judgment in favor of National Union because Cooper did not own the funds it lost within the meaning of the Policy. A more detailed discussion of each issue follows.

### A.  Whether the defined term employee is limited to a natural person

National Union argues that the Policy excludes coverage for the losses because it only insures against "employee" theft. The original Policy limits the definition of "employee" to "natural person." Because the Westridge Entities were corporations, not natural persons,

11

National Union maintains that Cooper cannot recover.

The original Policy does define the term "employee" as "[a]ny natural person." Doc. # 1-1 at 18. But later Endorsements to the Policy change that definition. Endorsement 10 provides that:

> 1. F, Definitions 5. Employee, is hereby amended to include the following:
>
>> a. Non-Compensated Officers, former employees hired as consultants, Janitors, watchmen and directors while performing duties normally performed by officers or employees of the Insured;
>>
>> b. *All U.S., U.K. and Canadian Fiduciaries*
>>
>> c. Any person while in your service (and for 60 days after termination of service)
>>
>> d. Contract workers.

Doc. #1-1 at 31. (emphasis added). And Endorsement 12 provides that

> 1. F, Definitions, "Employee" is hereby amended to include the following:
>
>> a. A trustee, administrator, employee or manager, including any outside administrator or manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan(s) (hereafter called Plan) insured under this policy;
>>
>> b. Any *natural person* required to be bonded in accordance with Section 412 of the Employee Retirement Income Act.
>
> 2. Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached policy other than as above stated.

*Id.* at 33 (emphasis added).

So although the original Policy limits the defined term "employee" to a "natural person," Endorsements 10 and 12 broaden that definition. Endorsement 10 amends the definition of "employee" to include "all US Fiduciaries." Doc. #1-1 at 31. Here, it is undisputed that

12

Westridge was a fiduciary of the Cooper Plans, (RFA No. 6, Doc. #52-23 at 5), and therefore it meets the definition of "employee" in that section.

Additionally, Endorsement 12 amends term "employee" to include "[a] trustee, administrator, employee or manager, including any outside administrator or manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan(s) . . . insured under this policy." Doc. #1-1 at 33 (emphasis added). Here, Westridge was an outside manager and independent contractor of the Cooper Plans, and therefore it meets the definition of "employee" in that section.

National Union could have chose to limit the definition of "employee" in Endorsements 10 and 12 to "natural person," as it did elsewhere in the Policy. For example, National Union placed the "natural person" limitation in subsection (b) of Endorsement 12. Doc. #1-1 at 33 (amending "employee" to include "[a]ny natural person required to be bonded in accordance with Section 412 of the Employee Retirement Income Act."). But although subsection (b) contains that limitation, subsection (a)—which amends "employee" to include outside investment managers—does not. The fact that National Union placed the natural person limitation in one part of Endorsement 12 but not the other suggests that the distinction was intentional.[8]

An insurance policy must be construed against the insurer, particularly where the question of interpretation involves an exception or limitation on the insurer's liability under the

---

[8] National Union also argues that the endorsements to the Policy should be read to amend, not replace, the prior definition of "employee." Doc. #75 at 19. And since paragraph 5.a.(4) of the Policy requires that an employee be a natural person and the later endorsements don't expressly revoke that requirement, the natural person requirement should be read in to the endorsements. *Id.* But the endorsements do not specifically amend paragraph 5.a.(4). They amend the definition of "employee" generally, and therefore are not subject to the natural person limitation.

policy. *Barnett*, 723 S.W.2d at 666. Here, the Court construes ambiguities against National Union. Because the endorsements do not clearly limit "employee" to "natural person," the Court finds that the term "employee" includes Westridge.

### B.   Whether the Trading Loss exclusion bars coverage

National Union also argues that the Trading Loss exclusion in the Policy bars coverage for Cooper's loss. Doc. #57 at 26, 75 at 22. The Policy excludes coverage for "[l]oss resulting from trading, whether in your name or in a genuine or fictitious account." Doc. #1-1 at 7. National Union maintains that Cooper suffered a "Trading Loss" because Cooper invested in WGTI by buying promissory notes, a type of security. *See Reves v. Ernst & Young*, 494 U.S. 56, 67, 110 S. Ct. 945, 952, 108 L. Ed. 2d 47 (1990). Thus National Union claims that Cooper's loss was caused by buying and selling securities and should be barred by the exclusion.

But the Court interprets the trading loss exclusion to bar coverage for losses resulting from market forces, not from theft. *See, e.g., Glusband v. Fittin Cunningham & Lauzon, Inc.*, 892 F.2d 208, 211 (2d Cir. 1989) ("The obvious purpose of the trading exclusion is to exempt from coverage losses caused by market forces, misjudgments of those forces by buyers and sellers of securities, or various errors or omissions—e.g., a failure to execute an order—in the course of trading."); *Ins. Co. of N. Am. v. Gibralco, Inc.*, 847 F.2d 530, 533 (9th Cir. 1988) ("Trading losses are generally understood to be market losses sustained by firms as a result of ill-advised, unauthorized, or simply unlucky trading decisions made in the purchasing, selling, or trading of securities.") (citation omitted).

Here, Cooper's losses were caused by theft, not market forces. Greenwood and Walsh stole principal and earnings from investors to conceal losing investments, pay off earlier

investors in their Ponzi scheme, and furnish their lavish lifestyles. Doc. #50 at 14. As the *Gibralco* court put it, the "losses were not caused by [ ] trades, but by [ ] dishonesty." 847. F.2d at 533. Because Cooper's losses were caused by theft, not trading, the Trading Loss exclusion does not bar coverage.

### C. Whether the Indirect Loss exclusion bars coverage

National Union argues that Cooper's loss should be excluded under the "Indirect Loss" exclusion. The Indirect Loss exclusion bars coverage for "[l]oss that is an indirect result of an 'occurrence' covered by this policy" including the "inability to realize income, or for the payment of damages of any type for which you are legally liable." Doc. #1-1 at 7. National Union claims that there was no direct loss here because Cooper loaned money to WGTI, which in turn invested in WGTC. Therefore Cooper was "one step removed" from the Ponzi scheme and its loss was indirect. *See Methodist Health Sys. Found., Inc. v. Hartford Fire Ins. Co.*, 834 F. Supp. 2d 493, 496 (E.D. La. 2011) (loss was indirect where insured invested in mutual fund, which in turn invested in hedge fund, which then invested in Ponzi scheme). But unlike in *Methodist*, here Cooper invested directly with the fraudsters. Cooper invested in WGTI, which was wholly owned and controlled by Greenwood and Walsh. Therefore, the loss was direct and not barred by the indirect loss exclusion.

### D. Whether Cooper may recover its lost earnings in the Ponzi scheme

National Union argues that Cooper cannot recover its lost investment earnings because in a Ponzi scheme like Westridge there is no way to tell whether earnings were legitimate or mere fraudulent accounting. Since Cooper ultimately got back more than it invested in Westridge, National Union argues that Cooper was a "net winner" in the Ponzi scheme and any gains

Cooper realized should be "set off" or credited against its losses.[9]

National Union insured Cooper against employee theft. It makes no difference whether it was theft of principal or of earnings. *See Nat'l Sur. Corp. v. Rauscher, Pierce & Co.*, 369 F.2d 572, 578 (5th Cir. 1966) (rejecting the notion that insurer was liable only to the extent that damages exceeded profits under employee theft policy). Greenwood and Walsh stole investors' money to cover up bad investments, pay off earlier investors, and fund their lavish lifestyles. To the extent that some of that money was Cooper's legitimate earnings, Cooper would be entitled to compensation under the Policy.

National Union claims that lost profits are not recoverable in a Ponzi scheme because the profits don't really exist, and cites a case involving the infamous Bernard Madoff Ponzi scheme for that proposition. *See Horowitz v. Am. Int'l Grp., Inc.*, No. 09 CIV. 7312 PAC, 2010 WL 3825737, at *7 (S.D.N.Y. Sept. 30, 2010) *aff'd*, 498 F. App'x 51 (2d Cir. 2012) (rejecting claim for lost profits in Madoff Ponzi scheme where the profits were entirely fabricated because "[t]he money reflected in the final account statement was not taken from the Plaintiffs by fraud; rather, it never belonged to them, or even existed, in the first place due to fraud.").

However, pure Ponzi schemes like *Horowitz* in which there were no actual investments or earnings of any kind are distinguishable from cases involving theft of assets that a company actually owns:

> the cases cited by [the insurer] dealing with "theoretical or bookkeeping loss" [such as *Horowitz*] are inapposite. These cases establish that "direct loss" does not include a loss of "potential income," loss of "something [a plaintiff] never

---

[9] In its Motion for Summary Judgment, Cooper distinguishes between the "alpha" and "beta" sides of the investment, and asks the Court to hold that National Union is not entitled to a credit for the amount that Cooper earned on either. Doc. #50 at 28-31. The Court makes no distinction between the different funds here. National Union is not entitled to a credit or set off on any of Cooper's earnings in any different funds.

actually owned but may have thought [it] owned," or employee actions causing a company to incur liability to third parties. While we agree that such losses are speculative or theoretical, they are easily distinguished from a situation involving theft of assets that a company actually owns.

*BJ Servs. S.R.L. v. Great Am. Ins. Co.*, 539 F. App'x 545, 550 (5th Cir. 2013) (unpublished)

(citing *Horowitz*, 2010 WL 3825737 at *7; *Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*, No. CV305–167, 2007 WL 4973847, at *5 (S.D. Ga. Sep. 14, 2007))

Here, Cooper claims that Westridge generated over $580 million in profits between 1996 and 2009 via its legitimate trading strategies.[10] That was real income, not fabricated profits, and Cooper would be entitled to recover for its loss.

To be sure, it may be difficult to sort out fact from fiction. The Westridge Entities had a long history of commingling funds, employing fraudulent accounting practices, and operating with utter disregard for corporate governance. *Walsh*, 712 F.3d at 741. In fact, the court in *3M Company, et. al., v. National Union Fire Ins. Co. of Pittsburgh, PA*, Case No. 14-cv-01058, slip op. at 6-7 (D.C. Minn. Sept. 28, 2015) questioned, without deciding, whether an investor could "untangle" the massive Ponzi scheme operated by Greenwood and Walsh to quantify the amount of legitimate earnings it lost to fraud. The court noted that "[e]very neutral observer who has been involved in this matter—including the receiver, the CFTC, the SEC, the United States District Court for the Southern District of New York, and the Second Circuit—appears to believe that what 3M proposes to do is impossible." *Id.*

But the fact that a loss is difficult to quantify doesn't mean it is impossible. It would be inequitable for Cooper to be denied recovery because of the sheer complexity of the fraud.

---

[10] The Receiver calculated that WGTC and WGTI had combined net earnings of $330.6 million between 1996 and 2008. Doc. #75 at 13. The discrepancy between Cooper's and the receivers' figures, if any, is a question of fact that the Court will not explore at the summary judgment stage.

Difficult though it may be to unravel, the amount of Cooper's loss is a question of fact that Cooper would be entitled to present to a jury. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997) ("Texas does not lightly dispense with the right to a jury trial. We have long recognized that the Texas Constitution confers an exceptionally broad jury trial right upon litigants. And we have warned that courts must not lightly deprive our people of this right by taking an issue away from the jury.") (citations omitted). To the extent Cooper could prove that the Westridge Entities made legitimate gains and that Cooper was entitled to a portion of them, Cooper would be entitled to recover for those losses. National Union would be free to introduce evidence that part or all of the profits were fabricated.

### E.   Whether Cooper's failure to provide timely notice to National Union bars recovery

National Union argues that Cooper failed to provide timely proof of loss as required by the Crime Policy, and is therefore barred from recovering even if National Union was not prejudiced by the delay.

In Texas, an insured's failure to timely notify the insurer of a claim typically does not relieve the insurer of liability unless the insurer is prejudiced. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 632–634 (Tex. 2008) (insured's failure to timely notify insurer of claim did not defeat coverage where insurer was not prejudiced by delay; only a material breach of covenant to give notice will excuse insurer's liability); *Coastal writ ref'd & Mktg. v. United States Fid. & Guar. Co.*, 218 S.W.3d 279, 284–290 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (insurer was required to show prejudice from insured's failure to provide timely notice of claim as demonstrated by actual prejudice from a material change in position). The cases are based on the principle that "one party is excused from performing under a contract only if the other party

18

commits a material breach." *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014),

*reh'g denied* (Nov. 21, 2014).

Those decisions do not concern commercial crime policies like the one at issue here. But

the same principle applies. *See, e.g., Ridglea Estate Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d

474, 480 (5th Cir. 2005) (construing Texas law to require a showing of prejudice for insurer to

avoid coverage because of untimely notice under occurrence policy, even for types of insurance

not covered by Board Order 23080); *PAJ*, 243 S.W.3d at 634 ("Since our decision in Hernandez,

courts and several major treatises have acknowledged Texas as a state that has adopted a notice-

prejudice rule."). *But see Flores v. Allstate Texas Lloyd's Co.*, 278 F. Supp. 2d 810, 816 (S.D.

Tex. 2003) (declining to require insurer to demonstrate prejudice for insured's failure to provide

notice) (footnote omitted).[11] Accordingly, the Court finds that National Union must show

prejudice from Cooper's failure to timely provide proof of loss.

Here, there is no evidence that National Union was prejudiced by Cooper's delay.

Although National Union claims that it will demonstrate at trial that it has lost the benefit of a

timely proof of loss, Doc. # 75 at 17, it has put forth no facts to support that argument. To the

contrary, National Union waited two years after receiving the proof of loss before taking a final

coverage position. Further, National Union opined in February 2011 that proof of loss was

premature because the Receiver had not yet finished its investigation. Doc. # 50 at 20 ("until the

liquidation of the assets of Westridge and its related entities by the Receiver is concluded, it is

unknown if any loss, insured or uninsured, might exist."). If proof of loss was premature in

---

[11] Indeed, "the [prejudice] rule is needed more in embezzlement insurance cases, where delay in
filing proofs of loss is much less likely to harm insurers than it is in liability insurance cases,
where the defenses of no negligence and contributory negligence often depend upon early
investigation." *B & H Supply Co. v. Ins. Co. of N. Am.*, 66 N.C. App. 580, 586, 311 S.E.2d 643,
647 (1984).

February 2011, it can hardly have been untimely when Cooper submitted it in *January 2010*. Because National Union cannot demonstrate that it was prejudiced by Cooper's late notice and proof of loss, Cooper is not barred from recovering on that ground.

### F.   Whether a jury could conclude that National Union acted in bad faith

Cooper asserts that National Union acted in bad faith in denying the claim and there is substantial evidence from which a jury could so conclude.

An insurance company has a duty to deal fairly and in good faith with its insured. *See Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997) (citing *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). The touchstone of bad faith liability under Texas law is unreasonableness in the processing of insurance claims. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 64 (Tex. 1997). To establish that an insurer has breached its duty of good faith and fair dealing, an insured must prove that: (1) that the insurer had no reasonable basis for denying or delaying payment of the claim; and (2) that the insurer knew or should have known that fact. *Id.* at 63; *Nino v. State Farm Lloyds*, No. 7:13–CV–318, 2014 U.S. Dist. LEXIS 163993, at *9, 2014 WL 6674418 (S.D. Tex. 2014); *Amarillo Hospitality Tenant, LLC v. Massachusetts Bay Ins. Co.*, No. 2:14-CV-00143-J, 2015 WL 1954053, at *3 (N.D. Tex. Apr. 29, 2015).

The test for the breach of the duty of good faith and fair dealing applies to both common law claims for bad faith and statutory claims brought under the Texas Insurance Code. *See Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005); *Tex. Mut. Ins. Co. v. Sara Care Child Care Ctr., Inc.*, 324 S.W.3d 305, 317 (Tex. App. 2010). Generally, the question of "whether an insurer acted in bad faith because it denied or delayed payment of a claim after its

liability became reasonably clear is a question for the fact-finder." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997).

Here, there is insufficient evidence from which a jury could conclude that National Union acted in bad faith. National Union's construction of the Policy was reasonable. The Policy could be read to limit the term "employee" to a "natural person." It could also be read to exclude Cooper's loss as a loss of property that Cooper did not own, lease, or hold. Indeed, the court in *3M* agreed with that position. Case No. 14-cv-01058. Regardless of whether National Union's interpretations are correct, they are not unreasonable. *See Oram v. State Farm Lloyds*, 977 S.W.2d 163, 167 (Tex. App.—Austin 1998, no pet.) (refusal to pay based on interpretation of insurance contract by a federal court that was later rejected by the Texas Supreme Court was not an unreasonable basis as a matter of law); *Pioneer Chlor Alkali v. Royal Indem. Co.*, 879 S.W.2d 920, 939–940 (Tex. App.—Houston [14th Dist.] 1994, no writ) (insurer's denial of claim based on an interpretation of ambiguous language in an exclusion was not bad faith even though court ultimately rejected insurer's interpretation, in part because case law on proper interpretation was not settled).

National Union also conducted a reasonable investigation of Cooper's claim. It hired forensic accountants to determine whether Cooper had suffered a loss. And although it took two years to issue a coverage decision, there is no evidence that the delay was in bad faith. *Gen. Star Indem. Co. v. Sherry Brooke Revocable Trust*, 243 F. Supp. 2d 605, 613 (W.D. Tex. 2001) (insurer's delay of twenty-one months to deny claim was not sufficient to raise a genuine issue of material fact). Indeed, Cooper itself contributed to the delay. Cooper took 11 months to file its proof of loss and many more to provide all the information requested. Doc. # 57 at 18; Doc. #75 at 16. Cooper can hardly claim a bad faith delay on National Union's part when it did the very

same thing.

Cooper also makes much of the fact that a National Union claims handler initially concluded that Cooper's loss was covered before National Union later reversed course and decided it was not. Doc. #68 at 26-27. Cooper also alleges that National Union's forensic accountants were really "litigation consultants" hired to build a case for denial. *Id.* But the Court is not persuaded. The fact that National Union abandoned a claims handler's initial conclusion is not unexpected given the complexity of the case and the years of investigation that ensued after the loss. Nor is there any evidence that National Union's forensic accountants were hired in a bad faith effort to deny coverage.

### G. Whether a jury could conclude that National Union acted knowingly or with gross negligence so as to support a punitive damages award

For the same reason that Cooper's bad faith claim fails, Cooper's claim for treble or punitive damages must also fail as a matter of law. Punitive damages are available in bad faith cases "[o]nly when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct," where "the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997) (noting that "punitive damages in Texas bad faith cases will be limited to highly unusual and particularly egregious situations.").

There is no evidence of conduct warranting punitive damages in this case. The record does not support an inference that National Union denied coverage knowing that decision was incorrect. Nor was there any "extreme risk" of death, grievous injury, or financial ruin resulting from National Union's denial of Cooper's claim. Accordingly, the Court finds there is no

evidence from which a jury could conclude that National Union acted knowingly or with gross negligence.

### H.  Whether Greenwood and Walshs' fraud must be imputed to Westridge

Cooper argues that WGTC's (i.e., Greenwood's) fraud must be imputed to Westridge because they entered into a joint venture to market their investment strategy, and thus acted as agents for each other. The Court agrees.

A joint venture is an undertaking by two or more persons jointly to carry out a common business enterprise for profit that falls short of an actual partnership. *Nelson v. Abraham*, 29 Cal. 2d 745, 749 (1947); Restatement (Third) of Agency § 3.03, cmt. e(2). A joint venture agreement, like a partnership agreement, need not be in writing. *See Ingram v. Deere*, 288 S.W.3d 886, 894 (Tex. 2009). Members of a joint venture act as agents of each other for achieving a common objective. *Fitz-Gerald v. Hull*, 237 S.W.2d 256, 264 (Tex. 1951). And "[i]t is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer is imputed to the principal." *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 325 (5th Cir. 1993) (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n. 9 (2d Cir. 1983)); Restatement (Third) Of Agency § 5.03 (2006).

Here, WGTC and Westridge entered into a joint venture to market their index arbitrage strategy. Doc. #50 at 13. They shared fees and marketed a combined investment product. *Id.* As joint venturers, they acted as agents for each other. Therefore, WGTC's acts are imputed to Westridge. And because WGTC (as well as WGTI) was wholly owned and controlled by Greenwood and Walsh, their fraud is imputed to Westridge as well.

National Union responds that WGTC's knowledge cannot be imputed to Westridge

because WGTC had an adverse interest to Westridge. Doc. #75 at 15 (citing *F.D.I.C. v. Lott*, 460 F.2d 82, 88 (5th Cir. 1972)). But the adverse interest exception only applies to fraud against a corporation, not fraud on behalf of a corporation. *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1992). Here, Greenwood and Walsh acted on behalf of the corporation because by serving Westridge, they served themselves. *Id.* at 171. Their fraudulent activities benefited themselves and injured outside investors. *Id.* Thus the fraud was committed on behalf of Westridge, not against it, and their knowledge is imputed to Westridge.

## I. Whether Cooper lost assets it "owned" under the Policy

Finally, National Union argues that there is no compensable loss because the insurance policy only covers money that Cooper "owned." At issue is the clause in the Policy which provides that

> [t]he property covered under this policy is limited to property: (1) That you own or lease; or (2) That you hold for others whether or not you are legally liable for the loss of such property.

Doc. #1-1 at 15. National Union argues that Cooper did not "own" the funds within the meaning of the Policy because Cooper did not invest directly in Westridge. Instead, Cooper loaned money to WGTI via promissory note, and WGTI then invested that money in WGTC. National Union argues that once Cooper loaned the money to WGTI it no longer "owned" the property within the meaning of the Policy, and thus cannot recover.

The court in *3M Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 14-CV-1058 (PJS/JSM), 2015 WL 5687879 (D. Minn. Sept. 28, 2015) agreed with National Union's position. There, the court considered whether 3M, another claimant in Greenwood and Walshs' Ponzi scheme, could be said to "own" its lost earnings within the meaning of a commercial crime

24

policy issued by National Union. 3M had invested in Westridge via WGTC. Applying Delaware law,[12] the court held that the claimant could not recover its lost earnings because its investment was structured as a limited partnership interest in WGTC and "Delaware law is crystal clear that a limited partner . . . has 'no interest in specific limited partnership property.'" *Id.* at 16 (citing Del. Code Ann. tit. 6, § 17-701; *In re Bernard L. Madoff Inv. Secs. LLC*, 708 F.3d 422, 427 (2d Cir. 2013) (under Delaware law, "the limited partnership interests sold by the Feeder Funds to investors . . . did not confer an ownership interest in money that the Feeder Funds ultimately invested in BLMIS"); *In re Marriott Hotel Props. II Ltd. P'ship*, No. CIV.A.14961, 2000 WL 128875, at *15 (Del. Ch. Jan. 24, 2000) (Section 17-701 "has been interpreted to preclude the attempt to equate ownership interests in a partnership with ownership of partnership property."). Therefore the court found that 3M did not "own" the property within the meaning of the Policy.

This Court agrees with *3M* and finds that Cooper did not "own" its lost earnings within the meaning of the Policy. Cooper invested in Greenwood and Walshs' Ponzi scheme via WGTI, which in turn invested in WGTC. Doc. #50 at 11; Doc. #57 at 11. Both entities were limited liability partnerships governed by Delaware law. Therefore at most, what Cooper held was a limited partnership interest in WGTI/WGTC, which under Delaware law does not confer ownership in the underlying property. In addition, Cooper was further removed from ownership than the claimant in *3M*. In *3M*, the claimant invested directly with WGTC. But here, Cooper chose to lend funds to WGTI in exchange for promissory notes. Then, WGTI invested in WGTC. Accordingly, the Court finds that Cooper did not "own" its lost earnings within the meaning of the Policy.

---

[12] The *3M* court found that Delaware law applied because WGTC's partnership agreements are governed by Delaware law. *3M*, slip op. at 16.

### 1.  ERISA

Cooper contends that ERISA should control question of ownership here and under ERISA's "look-through" rule, the Cooper plans are deemed to own the money held by WGTI and WGTC. Doc. # 68 at 16. Under ERISA, anyone who exercises discretionary control over a plan's assets is an ERISA fiduciary.  *Mertens v. Hewitt Assocs.*, 508 U.S.248, 251 (1993) (citing 29 U.S.C. § 1102(a)). A fiduciary's duties include "the proper management, administration, and investment of [plan] assets." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142-43 (1985); 29 U.S.C. § 1104(a). To enforce these mandates, the Department of Labor adopted a regulation called the "look-through" rule, which provides that when a plan acquires an equity interest in an investment fund, the plans assets are deemed to include both the equity interest and the underlying assets of that entity. *See* 29 CFR §2510.3-101(a)(2). Under the look-through rule, Cooper contends that it is deemed to own its earnings insofar as they are underlying assets of WGTI or WGTC. Cooper further contends that ERISA preempts any state laws to the contrary. *See* 29 U.S.C.A. § 1144 (2012) (ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered under ERISA statute).

But ERISA does not preempt Delaware state property law. ERISA's plan asset regulations are intended to "ensure that fiduciary responsibilities are spread broadly," but do not "attempt to redefine property rights established under state law." *3M*, slip op. at 19 (citing *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, No. 12 CIV. 1039 DLC, 2012 WL 3042986, at *8 (S.D.N.Y. July 25, 2012)). In *Jacqueline*, the court analyzed the Department of Labor's Regulations and found that "[n]either ERISA nor the regulations purport to affect ownership of property as a matter of general commercial law." *Id.* The court also noted that the Department of Labor, in an advisory opinion, confirmed that "the plan asset regulation does not

26

apply to property ownership as a matter of general commercial law," *id.* at 9,[13] and "[t]he document says nothing about the regulation as a means to redefine plan participants' property ownership rights writ large." *Id.* at *9. This Court agrees with the *3M* and *Jacqueline* courts and finds that ERISA does not control the issue of ownership in this case.

Nor will the Court look to ERISA to provide context in which to construe the meaning of "own" in the Policy. Although there are references in the Policy to benefit plans, ERISA, and DOL regulations, Doc. #102 at 4 n.8, none of them purport to define the word "own." "[T]he coverage of a fidelity insurance policy 'cannot be extended by implication, or enlarged by construction, beyond the actual terms of the agreement entered into by the parties.'" *Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*, 962 F. Supp. 956, 961 (N.D. Tex. 1996) *aff'd*, 140 F.3d 622 (5th Cir. 1998) (citations omitted). There is no indication that the parties intended the word "own" in the Policy to refer to ERISA's definition of ownership. Accordingly, the Court will not expand the term "own" to encompass ERISA's definition. The Court will look to state law to determine the meaning of "own."

### 2.   Beneficial ownership

Cooper also argues that even if ERISA does not bear on the question of ownership, Cooper should be considered to "own" the funds under the state law doctrine of beneficial ownership. Doc. #102 at 11. Beneficial ownership refers to the person who ultimately controls an asset and can benefit from it, even if she does not have legal title to it. Doc. # 102 at 8. Cooper

---

[13] Citing Advisory Opinion to Alden J. Bianchi, Opinion No.2003–05A, 2003 WL 1901900 (E.R.I.S.A) (Dep't of Labor Apr. 10, 2003). *See also* Advisory Opinion to Mr. Bruce Cooper, Opinion No.2011–10A, (Dep't of Labor Dec. 16, 2011) (*available at* www.dol.gov/ebsa/regs/aos/ao2011–10a.html) ("the assets of a plan are generally identified on the basis of ordinary notions of property rights under non-ERISA law.").

argues that even if it had no legal title to the funds it invested in WGTI/WGTC, the word "own" should be construed to include beneficial as well as legal ownership, and Cooper should be deemed the beneficial owner of the funds. *See Comerica Acceptance Corp. v. Dallas Central Appraisal Dist.*, 52 S.W.3d 495, 497 (Tex. App.—Dallas 2001) (construing the term "owner" under Texas tax law as "a person or entity holding legal title to the property, or holding an equitable right to obtain legal title to the property"); *AHF-Arbors at Huntsville I, LLC v. Walker Cnty. Appraisal Dist.*, 410 S.W.3d 831, 838 (Tex. 2012) (holding that "equitable ownership" of property qualified for tax exemption).

But the Court rejects the notion that the parties intended the word "own" in the Policy to include this concept of beneficial ownership. The only cases Cooper cites construing "own" to include beneficial ownership are Texas cases construing Texas tax statutes. None purported to apply the doctrine to interpret an ownership provision in an insurance contract between two private parties. The meaning of the contract is governed by the parties' intent. The Court declines to infer that the parties intended "own" to diverge from its common meaning under Delaware state law.

### 3.  Loss of Principal and Management Fees

Finally, Cooper argues that even if it the Court finds it does not own its lost earnings within the meaning of the Policy, it still owned its lost principal and management fees. Doc. #102 at 12. Cooper points out that the *3M* court never reached the question of whether 3M could own principal or management fees in that case.

First, the Court finds that Cooper is not entitled to recover its lost principal. As the Court stated above, Cooper relinquished ownership of its principal when it loaned the money to WGTI, which in turn invested in WGTC. Therefore it did not own the principal for the same reason that

28

it did not own the earnings. Thus when Cooper's principal was lost, it did not "own" it within the meaning of the Policy.[14]

Second, the Court declines to consider whether Cooper is entitled to its lost management fees. Cooper argues that it is entitled to lost management fees in the amount of $1,839,841 because these fees were paid directly to Westridge based on fraudulent invoices. This argument was raised for the first time in Cooper's supplemental brief. Doc. #102. The Court requested supplemental briefing on the question of "whether Cooper owned, leased, or held its lost earnings within the meaning of the commercial crime policy." This did not entitle Cooper to present an entirely new argument attempting to segregate its management fees, and the Court will not take up the question.

## IV.   Conclusion

For the reasons explained above, Cooper's Motion for Partial Summary Judgment (Doc. #50) is GRANTED. Defendant National Union's Motion for Summary Judgment (Doc. #57) is GRANTED. Cooper's Motion to Exclude Testimony of Defendant's Expert Robert Briganti

---

[14] Even if Cooper was fraudulently induced into making the loans, that does not change the fact that ownership of the money transferred to WGTI. *See BJ Servs. S.R.L. v. Great Am. Ins. Co.*, 539 F. App'x 545, 552 (5th Cir. 2013) (unpublished) (rejecting the argument that fraudsters "never received" title to assets that they had procured by fraud because "this amounts, at most, to fraudulent inducement and does not prevent title from passing to BJ Services.") (citing *Akers v. Scofield*, 167 F.2d 718, 720 (5th Cir. 1948) ("[A] transaction induced by fraudulent representations is not void but voidable, and, in the absence of an election to rescind, title that passed in such a transaction will continue in the recipient.").

(Doc. #64) and National Union's Motion to Exclude Expert Testimony (Doc. #65) are DENIED

AS MOOT.

        It is so ORDERED.

6/21/16

_____          _____
Date                                      The Honorable Alfred H. Bennett
                                          United States District Judge